IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JAN BYRNE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CASE NO. 2:06-CV-1084-WKW[WO] |
| v. | ) |
| | ) |
| ALABAMA ALCOHOLIC BEVERAGE | ) |
| CONTROL BOARD, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

Before the court is Defendants Alabama Alcoholic Beverage Control Board ("ABC

Board") and Emory Folmar's ("Folmar"; collectively "Defendants") Motion for Summary

Judgment (Doc. # 40), which is accompanied by a brief (Doc. # 41) and an evidentiary

submission (Doc. # 40).  Plaintiff Jan Byrne ("Byrne") filed a Response accompanied by

evidence (Doc. # 42) to which Defendants filed a Reply (Doc. # 44).  Pursuant to the court's

ruling on Defendants' previously-filed motion to dismiss (Doc. # 35), the claims in this case

have been narrowed.  The remaining claims that are the subject of the present summary

judgment motion are brought against Mr. Folmar, in his individual and official capacities,

under the Due Process Clause of the Fourteenth Amendment, as enforced by 42 U.S.C.

§ 1983 ("§ 1983"), and against the ABC Board for gender discrimination based upon

disparate treatment and hostile work environment, and for retaliation, in violation of Title VII

of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII").  Having

carefully reviewed the evidentiary submissions and the briefs of the parties, and after careful consideration of the law applicable to the case, the court finds that there are no material facts in dispute and that Defendants' motion is due to be granted.

## II.  JURISDICTION AND VENUE

Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1331 for all claims arising under federal law.  The court also has original jurisdiction over claims based upon alleged violations of civil rights.  *See* 28 U.S.C. § 1343.  The parties do not contest personal jurisdiction or venue, and the court finds that there are allegations sufficient to support both.

## III.  STANDARD OF REVIEW

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Under Rule 56, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden by presenting evidence showing there is no genuine issue of material fact, or by showing that the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-24.  "[T]he court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).

Once the moving party has met its burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Rule 56(e)(2). To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A genuine factual dispute exists if "a reasonable jury could return a verdict for the non-moving party." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (internal quotation marks and citation omitted).

## IV. FACTS

These are the relevant facts when viewed in the light most favorable to Ms. Byrne.[1] Ms. Byrne is a longtime employee of the ABC Board, a state agency. Mr. Folmar was appointed as the administrator of the ABC Board in 2003.

In 1990 or 1991, Ms. Byrne became the coordinator of the Responsible Vendor Program. Later, she assumed responsibility of the alcohol awareness aspects of the

---

[1] The court has considered only evidence that is admissible on its face or can be reduced to admissible form and that complies with Federal Rule of Civil Procedure 56(e). *Celotex Corp.,* 477 U.S. at 323-24; *Macuba v. DeBoer*, 193 F.3d 1316, 1322-24 (11th Cir. 1999).

Responsible Vendor Program.[2]  In that position, her performance appraisals were ranked as "exceeds standards" or "consistently exceeds standards," until her annual appraisal on May 22, 2007, when she was given a "partially meets standards" rating.  (Pl. Ex. 3 to Doc. # 42.)

One of the employees in the Responsible Vendor Program who reported to Ms. Byrne was Andy Knight ("Knight").  Mr. Knight, like Ms. Byrne, is a longstanding ABC Board employee, and from 1992 until October 2005, Mr. Knight held various classifications under the supervision of Ms. Byrne.  It was no secret that Ms. Byrne and Mr. Knight did not get along; the discord was so intense that for a period of time they would record their joint conversations for "self-protection."  (Pl. Dep. 101 (Exs 1 & 2 to Doc. # 40).)

On or about November 7, 2005, Mr. Knight filed his second grievance against Ms. Byrne.[3]  (*See* Pl. Dep. 73-74.)  On that date, Mr. Folmar called Ms. Byrne to his office. During that office meeting, he referenced Mr. Knight's grievance, but said that it "would [be]

---

[2] By statute, the ABC Board operates a Responsible Vendor Program "designed to encourage vendors and their employees and customers to treat alcoholic beverages in a responsible manner."  Ala. Code § 28-10-4.  The Responsible Vendor Program provides for certification of vendors through programs of instruction and allows for mitigation of administrative penalties or fines against certified vendors in the event of an illegal sale of alcoholic beverages.  *See* Ala. Code §§ 28-10-5 to 28-10-7. After its initial creation, the Responsible Vendor Program was broadened to include alcohol awareness.

[3] The first grievance was filed in the 1990s.

discuss[ed] . . . in the future."[4]  (Pl. Ex. 5, at 1.)[5]  Mr. Folmar raised several matters related

to Ms. Byrne's job performance, including his disapproval of her delegation of certain job

duties and the manner in which she handled a job-related trip.  (Pl. Ex. 5 to Doc. # 42.)   As

to the latter, Mr. Folmar admonished her for not seeking prior approval to attend a meeting

in Washington, D.C.  (Pl. Ex. 4.)  In Ms. Byrne's words, Mr. Folmar

> said that when he asked me for clarification on my attendance at the State
> Meeting in D.C. through a memo, he expected me to respond before going on
> the assignment.  He said that his approval for me to go to the meeting was
> superceded by the request for further information by him.  He said that if I ever
> left for an assignment without responding to his question, I should not return
> to the office because he was going to fire me.

(Pl. Ex. 5 to Doc. # 42.)  He also accused her of "getting a free-ride at work."  (Pl. Ex. 5.)

Concerning Ms. Byrne's complaints that Mr. Folmar squelched her business travel,

it is undisputed that he "reigned in the travel."  (Folmar Dep. 16.)  For instance, on October

11, 2005, Mr. Folmar issued a written directive to all ABC Board employees that "all

requests for any ABC Board personnel to speak, make appearances, or do workshops outside

of this agency, must first be approved by [the Administrator]."  (Def. Ex. 3 to Pl. Dep. (Doc.

# 40-3); *see also* Folmar Dep. 25 ("I said nobody is going on any more trips until [he or she]

submits a trip ticket to my office.").)  In particular, as to Ms. Byrne, Mr. Folmar believed that

---

[4] As to Mr. Knight's November 7 grievance against her, Ms. Byrne was dissatisfied with Mr. Folmar's handling of that grievance.  Basically, according to Ms. Byrne, although it was determined that she "had done nothing wrong" (Pl. Dep. 145; *see also* Pl. Dep. 146-47), Mr. Folmar nonetheless orally admonished her for not "getting along" with her employees and was generally unsupportive of her (Pl. Dep. 147).

[5] Exhibit 5 is a memorandum prepared by Ms Byrne in which she recounts what transpired during the November 7, 2005 meeting.  The memorandum was prepared on November 14, 2005.

her extensive business trips were disruptive and that many of the trips "had no bearing whatsoever on ABC operations." (Folmar Dep. 25.) In his words,

> [W]hen I . . . found that [Ms. Byrne] had taken 29 trips in a year and wasn't tending to her business, then it became very much on my radar screen. And at that point I began to look into it and found that there was great turmoil, if you will, in her bureau. I decided I would have to straighten it out. It called for some attention at that time.

(Folmar Dep. 14.)

On November 14, 2005, Ms. Byrne tried to file a grievance against Mr. Folmar with the ABC Board's personnel office. The grievance alleged "different, unfair treatment due to gender (re: Andy Knight and myself)," "threats of job loss and future reprisal," and "hostile work environment through intimidation." (Ex. 10 to Doc. # 42.) The ABC Board's personnel manager advised Ms. Byrne that she could not file a grievance against Mr. Folmar because he was not a merit system employee and that any complaint against Mr. Folmar would have to be submitted to the Governor, who appointed Mr. Folmar. At some undisclosed point in time, the personnel manager informed Mr. Folmar of Ms. Byrne's complaint, and Mr. Folmar instructed her to "deal with it." (Folmar Dep. 34 (Doc. # 40-7).)

The next day, on November 15, 2005, Mr. Folmar completed a preprinted form, titled "Counseling/Oral Reprimand." (Pl. Ex. 12 to Doc. # 41.) The form provides that it "is to be used by supervisors to document remedial discussions with employees," in this case the discussion that occurred between Mr. Folmar and Ms. Byrne on November 7, 2005. (Pl. Ex. 12.) It further indicates that a counseling session "is not disciplinary." (Pl. Ex. 12.) It

6

provides: "Ms. Byrne did not follow a directive to provide more information on a pending trip to Washington, D.C. Ms. Byrne proceeded to go on the trip any way." (Pl. Ex. 12.) As documented on the form, the "problem [was] . . . resolved" with a directive that "Ms. Byrne . . . inform the Administrator, in advance and in writing, of all outside speaking engagements to include workshops and appearances. She will do this herself and not delegate it to someone else in her division." (Pl. Ex. 12.) No evidence is cited indicating that Ms. Byrne suffered any repercussions based upon this counseling memorandum.

Ms. Byrne contends that, beginning in November 2005 (*see* Pl. Dep. 155), around the time when Mr. Knight filed a grievance against her, Mr. Folmar began treating her adversely.[6] She says that Mr. Folmar has excluded her from agency-level conferences, has denied her requests to attend national meetings, has denied her staffing and budget requests, has declined to provide technical support to her division, and has taken away certain job equipment (such as her state-provided vehicle, laptop and radio). Additionally, her reserved parking spot has been forfeited, and at staff meetings she has been relegated to sitting with the clerical staff and has been dismissed with the clerical staff while the professional staff has remained to conduct business.

Of particular significance to Ms. Byrne, in mid-May 2006, Mr. Folmar reorganized the Responsible Vendor Program by placing it under a different division – *i.e.*, the Enforcement Division – to be headed by Captain Vance Patton ("Patton"). This

---

[6] The details of the alleged acts are outlined in the parties' briefs and in the evidence. The acts that are supported by admissible evidence have been considered.

7

reorganization resulted in Mr. Folmar removing Ms. Byrne from the leadership of the Responsible Vendor Program.  Mr. Folmar says that he implemented the reorganization because he believed that "[e]nforcement [was] the key to underage drinking," and that, consistent with a nationwide trend, the proper place for the Responsible Vendor Program was under the Enforcement Division.  (Folmar Dep. 17.)  Indeed, transfer of the Responsible Vendor Program into the Enforcement Division had been the subject of a memorandum that preceded Mr. Folmar's 2003 appointment as the administrator.  (Folmar Dep. 42; *see also* Pl. Dep. 55 (confirming that she had "heard" of discussions at the ABC Board about moving the Responsible Vendor Program into the Enforcement Division "off and on for years and years").)  After obtaining clearance from the Alabama State Personnel Department, Mr. Folmar issued a written directive on May 16, 2006, effectuating this organizational change. (*See* Pl. Ex. 7 to Doc. # 42 ("Effective today, the Alcohol Awareness/Responsible Vendor Program will be combined with the Enforcement Division under the command and administrative control of the director of enforcement.").)

The reorganization has had no effect on Ms. Byrne's salary, benefits or job title, but Ms. Byrne contends that it has had a negative impact on her job in other ways.  Before the reorganization of the ABC Board in May 2006, Ms. Byrne reported directly to Mr. Folmar. (Pl. Dep. 37.)  After the reorganization, she no longer "work[ed] under Mr. Folmar's immediate supervision" (Pl. Dep. 145), but rather she reported to Captain Patton, who in turn reported to Mr. Folmar.  Moreover, it is undisputed that, when the Responsible Vendor

Program was placed under Captain Patton's command, Ms. Byrne's job duties changed and became more administrative.  Also, as detailed *supra*, Ms. Byrne now is in the office the majority of the time, when before she had traveled often.

On May 25, 2006, Ms. Byrne filed a "formal[]" grievance against Mr. Folmar with the ABC Board.  (Ex. 12 to Pl. Dep.)  In that grievance, she referenced her earlier attempt on November 14, 2005, to file a grievance with the ABC Board's personnel manager, and she reiterated her claims of "unfair treatment" based upon her gender, "threats of job loss and future reprisal," and "hostile work environment through intimidation."  (Ex. 12 to Pl. Dep.)  Also, on that same day,[7] Ms. Byrne was administered an oral reprimand for "fail[ing] to contact her supervisor on 05/19/06 to request/report she needed to use sick leave."  (Pl. Ex. 13 to Doc. # 42.)

Ms. Byrne's May 25 grievance was investigated by one of the ABC Board's outside attorneys, and on August 22, 2006, the ABC Board advised Ms. Byrne that it found no evidence of unfair treatment against her regarding any existing policy or practice, and informed her that it would not amend the reorganization of the Responsible Vendor Program, as Ms. Byrne had requested.  (*See* generally Randy Dempsey Aff. (Ex. 6 to Doc. # 40).)

Seeking redress for alleged workplace discrimination and retaliation, Ms. Byrne filed a charge of discrimination on July 6, 2006, against the ABC Board with the Equal

---

[7] (*But see* Ex. 12 to Pl. Dep. in which Ms. Byrne indicates that she was orally reprimanded the day *prior to* filing her formal grievance.)  For present purposes, because it is to Ms. Byrne's advantage, the court has assumed that the two events – the grievance and the oral reprimand – occurred on the same day.

Employment Opportunity Commission ("EEOC").  This Title VII/§ 1983 lawsuit followed on December 6, 2006.  Mr. Folmar is sued in his individual and official capacities.  The ABC Board, as Ms. Byrne's employer, also is sued.  The Second Amended Complaint (Doc. # 21) governs, but it must be read in conjunction with the court's prior order (Doc. # 35) dismissing some of those claims.

On May 17, 2007, after this lawsuit had commenced, Ms. Byrne was issued a written reprimand by Captain Patton for "minor violation[s]" pertaining to "inattention to job," "failure to perform job properly," and "disruptive conduct . . ., including a lack of cooperation and an unpleasant behavior towards fellow employees and/or supervisor."  (Pl. Ex. 14 to Doc. # 41.)  This reprimand was a catalyst prompting Ms. Byrne to file a grievance on May 21, 2007, with the ABC Board.  In that grievance, Ms. Byrne complained about, among other things, a "hostile work environment," "[h]umiliation, embarrassment and loss of respect from peers and co-workers[,]" as well as "retaliation."  (Pl. Ex. 11 to Doc. # 42.)

## V.  DISCUSSION

### A.    Claims Not at Issue

It is important to outline at the outset what is not at issue.  First, in her brief, Ms. Byrne injects a claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1).  (Doc. # 42-17, at 17-20.)  An ADEA claim is not included in the Second Amended Complaint, and its inclusion in a brief is of no legal import.  *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her

complaint through argument in a brief opposing summary judgment."). Also, Ms. Byrne's claims against Mr. Folmar alleging age discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment previously were conceded by Ms. Byrne and dismissed by order of the court. (Doc. # 35, at 6-7, 24.) Hence, in this case, there remain no issues pertaining to age discrimination.

Second, in the court's prior order (Doc. # 35), Ms. Byrne's claims alleging gender discrimination in violation of the Equal Protection Clause were dismissed. (Doc. # 35, at 6-7, 24.) Ms. Byrne's attempt (Doc. # 42-17, at 10, 11) to resurrect those previously-dismissed claims in a brief is ineffective. Briefs are not pleadings, *see* Fed. R. Civ. P. 7(a) (defining pleadings as "a complaint," "a third-party complaint," "an answer," and "a reply to an answer"), and leave to amend the Second Amended Complaint has not been sought, *see Gilmour*, 382 F.3d at 1315.

Third, although the Fourteenth Amendment due process claim survived the earlier-filed motion to dismiss (Doc. # 42-17, at 11; Doc. # 35, at 7, 13-14, 24), Ms. Byrne has not addressed Defendants' properly-supported contentions establishing that no genuine issue of material fact exists as to this claim. (Doc. # 41, at 17-19.) Because she has not relied upon this claim in summary judgment, it is "abandoned."[8] *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate

---

[8] Even if the claim had not been abandoned, the court would find, for substantially the same reasons argued by Defendants (Doc. # 41, at 17-20), that the claim fails on the merits.

arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

**B.    Claims Against Mr. Folmar**

The foregoing discussion disposes of Counts One through Four of the Second Amended Complaint.  Because these are the only four counts naming Mr. Folmar as a Defendant, summary judgment is due to be entered in Mr. Folmar's favor on all claims brought against him.[9]

**C.    Claims Against the ABC Board**

At issue are the Title VII claims against the ABC Board for gender discrimination based upon disparate treatment and hostile work environment, and for retaliation.  On this record, the analysis of the Title VII claims is governed by the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

**1.    *Gender Discrimination:  Disparate Treatment***

An "indispensable element" of Ms. Byrne's *prima facie* case on her Title VII gender discrimination claim alleging disparate treatment is proof of an "adverse employment action." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1246 (11th Cir. 2001).  "Although an adverse employment action need not be an ultimate employment decision, such as termination, failure to hire or demotion, it must meet a 'threshold level of substantiality.'" *Grimsley v. Marshalls of MA, Inc.*, 284 F. App'x 604, 608 (11th Cir. 2008) (quoting *Davis*,

---

[9] It, thus, is unnecessary to address all of Mr. Folmar's arguments, including his assertion of qualified immunity (Doc. # 35, at 20-23), although those arguments are persuasive.

245 F.3d at 1238-39).  In the context of "Title VII's anti-discrimination clause," an adverse employment action is a "*serious and material* change in the terms, conditions, or privileges of employment[,]" and that change must be viewed through the lens of "a reasonable person in the circumstances."  *Davis*, 245 F.3d at 1239.  *Davis*'s requirement of a serious and material change necessarily means that "not all conduct by an employer negatively affecting an employee [will] constitute[] adverse employment action."  *Id.* at 1238.  "Title VII is neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace."  *Id.* (citations and internal quotation marks omitted).

Ms. Byrne has listed numerous acts that she says demonstrate adverse employment actions.  Ms. Byrne contends that "[r]emoving [her] from having any authority and reducing her duties to mere clerical work" are adverse employment actions.  (Doc. # 42-17, at 12.) She also complains of not being permitted to participate in various national and state alcohol and drug awareness organizations, of being "reprimand[ed],"[10] and of being deprived of certain job equipment, including her state-provided vehicle and laptop.  (Doc. # 42-17, at 13; Pl. Dep. 199-201.)  Defendants' argument rests primarily on an assertion that the actions complained of do not qualify as adverse employment actions.  (Doc. # 41, at 32-36.)  Upon careful consideration, the court agrees with Defendants.

---

[10] These "reprimands," although not clearly delineated by Ms. Byrne (*see* Doc. # 42-17, at 13), presumably include the November 15, 2005 "Counseling/Oral Reprimand" (Pl. Ex. 12 to Doc. # 41), and the May 25, 2006 oral reprimand for Ms. Byrne's "failure to contact her supervisor on 05/19/06 to request/report she needed to use sick leave" (Pl. Ex. 13 to Doc. # 42).  Both of these actions predate the filing of Ms. Byrne's EEOC charge.

On the facts presented, the removal of Ms. Byrne's supervisory responsibilities and the shift of her post-reorganization duties to those more clerical are not the type of serious and material changes contemplated by *Davis*. *See Davis*, 245 F.3d at 1232 (noting that changes in job duties generally do not constitute an adverse employment action); *see also Portera v. State of Ala. Dep't of Fin.*, 322 F. Supp. 2d 1285, 1294 (M.D. Ala. 2004) (finding that the "removal of supervision [was] not an adverse-employment action because it [was] not 'a serious and material change in the terms, conditions, or privileges of employment.'" (brackets added) (quoting *Davis*, 245 F.3d at 1238)), *aff'd*, 133 F. App'x 739 (11th Cir. 2005). As observed in *Davis*, "[A]pplying the adverse action requirement carefully is especially important when the plaintiff's claim is predicated on his disagreement with his employer's reassignment of job tasks." 245 F.3d at 1244. Such claims "strike at the very heart of an employer's business judgment and expertise," and, in particular, with regard to public entities, their responsibility of "balanc[ing] limited personnel resources with the wide variety of critically important and challenging tasks expected of them by the public." *Id.* Here, it is undisputed that no economic harm accompanied these changes in Ms. Byrne's job tasks, and the court finds that Ms. Byrne has not presented an "unusual" set of circumstances. *Id.* at 1245; *see also id.* (citing as an example of an "unusual instance[]" *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1077-78 (11th Cir. 1996), in which the court held that the jury should have been permitted to consider as a basis for the plaintiff's discrimination claim

that he was stripped of his supervisory duties in the newspaper's camera department and assigned to clean toilets as a janitor).

The counseling memorandum and the oral reprimand also are legally insufficient to satisfy the adverse-action element of her Title VII claim.  *Davis* disposes of Ms. Byrne's reliance on the counseling memorandum as an adverse employment action.  In *Davis*, the Eleventh Circuit held that a "counseling memorandum" that labeled as "unacceptable" the plaintiff's failure to turn in required paperwork was not an adverse employment action.  245 F.3d at 1240.  The memorandum was not part of the employer's formal disciplinary procedure, and it did not result in "any tangible consequence . . ., in the form of a loss of pay or benefits or further discipline."  *Id.*  The Eleventh Circuit said, "An employee who receives criticism or a negative evaluation may lose self-esteem and conceivably may suffer a loss of prestige in the eyes of others who come to be aware of the evaluation."  *Id.* at 1242.  "But the protections of Title VII simply do not extend to 'everything that makes an employee unhappy.'"  *Id.* (citation omitted); *see also Njie v. Regions Bank*, 198 F. App'x 878, 883 n.8 (11th Cir. 2006) ("In this circuit, criticisms of an employee's job performance that do not result in tangible job consequences are not a proper predicate for a Title VII action." (citing *Davis*, 245 F.3d at 1241 ("[C]ourts are wisely reluctant to treat job performance memoranda as actionable under Title VII where they do not trigger any more tangible form of adverse action such as a loss in benefits, ineligibility for promotional opportunities, or more formal discipline." (collecting cases))).

Here, as in *Davis*, Ms. Byrne has not presented any evidence that she suffered a tangible job consequence as a result of the counseling memorandum.  It is undisputed that the counseling memorandum did not result in the loss of any economic benefits, and no argument has been made that it had any effect on her future career opportunities.  Indeed, she does not even complain of a negative job evaluation during this time period.  *Cf. Davis*, 245 F.3d at 1240 ("[S]hortly after this [counseling] memo, [the plaintiff] received his annual evaluation with an overall rating of 'excellent.'" (brackets added)).  No tangible adverse effect on the terms, conditions or privileges of her employment has been cited.

Job criticisms received as part of an employer's formal disciplinary scheme were not at issue in *Davis*.  Nonetheless, no evidence has been cited or argument made (*see* Doc. # 42-17, at 13) by Ms. Byrne, that the May 25, 2006 oral reprimand, which is the first step in the ABC Board's disciplinary scheme, caused Ms. Byrne any economic injury or otherwise had a "tangible adverse effect" on her job, *Davis*, 245 F.3d at 1239.  *See also Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 613 (7th Cir. 2001) (Oral and written reprimands issued pursuant to the employer's progressive discipline system did not "implicat[e] sufficiently 'tangible job consequences' to constitute an independent basis of liability under Title VII.").  *Davis*'s principles likewise support Defendants' position.  On this record, the court finds that there is no basis from which to infer that the oral reprimand was a serious and material change in the terms of Ms. Byrne's employment.

Moreover, the prohibition against Ms. Byrne's membership in certain state and national organizations and the removal of job tools may have made her job duties less desirable and the performance of certain tasks more difficult to perform.  However, for the same reason above – *i.e.*, the absence of evidence of a tangible job consequence – neither is an adverse employment action.[11]  Ms. Byrne's desirability for an improved, more congenial, work environment, although understandable on the facts alleged, simply does not equate with the substantiality required to hurdle summary judgment on the adverse-action prong of her *prima facie* case.[12]  *See, e.g.*, *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007) (Actions amounting to a "mere inconvenience" do not constitute an adverse employment action.); *Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911, 912 (7th Cir. 2002) (The denial of "'better' equipment" and "the ability to travel and make presentations" were "not readily quantifiable losses Title VII was meant to redress.").

---

[11] Although arguably forfeited because not relied upon in Ms. Byrne's summary judgment brief (Doc. # 42-17, at 12-13); *see Resolution Trust Corp.*, 43 F.3d at 599 ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), the other actions about which she complains – to include her exclusion from professional staff meetings and the retraction of an assigned parking space – also are the sorts of tribulations that are not so extraordinary as to rise to the level of an adverse employment action.  *Cf. Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1189 (10th Cir. 2002) (Fact that the plaintiff was "taken out of the information loop" was not a materially adverse employment action.).

[12] *Davis* also rejected an argument by the plaintiff that the acts at issue, when "viewed as a whole," demonstrated an adverse employment action.  245 F.3d at 1245.  Although it is not clear if Ms. Byrne makes that argument, to the extent that she does, it is rejected.  As in *Davis*, collectively, the incidents are "insubstantial" and "relatively minor" when compared to the Eleventh Circuit decision oft cited for the "collective" theory.  *See id.* (citing *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453 (11th Cir. 1998)).

17

In sum, the complained-of actions – which undisputedly did not result in a loss of pay, job benefits, or other compensatory disadvantage – are neither serious nor material within the meaning of *Davis*.  The actions simply do not meet the threshold level of substantiality required, but rather fall within the confines of non-actionable "tribulations of the workplace," *Davis*, 245 F.3d at 1239 (citation and internal quotation marks omitted).  Because Ms. Byrne has failed to establish a critical element of her *prima facie* case, her Title VII gender discrimination claim alleging disparate treatment fails.  Summary judgment, therefore, is due to be entered in favor of the ABC Board on this claim.[13]

## 2.    *Gender Discrimination: Hostile Work Environment*

Ms. Byrne also has failed to sustain her summary judgment burden on at least two of the elements required to establish a gender-based hostile work environment claim.  To succeed on a hostile work environment claim, Ms. Byrne must show, among other elements, (1) "'that the harassment [was] based on'" her sex, and that (2) "'the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.'" *McCann v. Tillman*, 526 F.3d 1370, 1378

_____

[13] Even if Ms. Byrne had established a *prima facie* case, the ABC Board has come forward with legitimate and nondiscriminatory reasons for its actions, *e.g.*, that the restrictions on travel were across the board, that the majority of Ms. Byrne's travel was excessive and unnecessary, and that the restructuring of the Responsible Vendor Program, contemplated for a number of years, was believed to be in the best interest of that program and was consistent with the current practice in other states.  (Doc. # 41, at 39-40; Doc. # 44, at 9-11.)  In the section of her brief captioned "gender discrimination," Ms. Byrne provides no rebuttal whatsoever to the ABC Board's legitimate, nondiscriminatory reasons.  (Doc. # 42-17, at 11-13.)  Liberally construing other sections of Ms. Byrne's brief as applying to the issue of pretext on the disparate treatment claim (*see, e.g.*, Doc. # 42-17, at 16-17), those arguments are wholly insufficient to raise a jury issue as to whether the proffered reasons are a coverup for gender discrimination.

(11th Cir. 2008) (quoting *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir.

2002)); *Sims v. Montgomery County Comm'n*, 766 F. Supp. 1052, 1073 (M.D. Ala. 1990).

("Conduct of a nonsexual nature which, for example, ridicules women or treats them as

inferior, can constitute prohibited sexual harassment."). To rise to the requisite level of

severity or pervasiveness, "a court looks to 'all the circumstances,' including 'the frequency

of the discriminatory conduct; its severity; whether it is physically threatening or humiliating,

or a mere offensive utterance; and whether it unreasonably interferes with an employee's

work performance.'" *Id.* (quoting *Nat'l Ry. Passenger Corp. v. Morgan*, 536 U.S. 101, 116

(2002)). The "standards for judging hostility are sufficiently demanding to ensure that Title

VII does not become a 'general civility code.'" *Faragher v. City of Boca Raton*, 524 U.S.

775, 788 (1998).

Ms. Byrne says that the same evidence submitted in support of her Title VII disparate

treatment claim also demonstrates that she has been the victim of a hostile work environment

because she is female. (*See* Doc. # 42-17, at 14.) The court has considered the effect of

these acts on the working environment, "in context, not as isolated acts," *Mendoza*, 195 F.3d

at 1246, and finds that, in their totality, the alleged incidents do not satisfy the Eleventh

Circuit's "baseline" for severity or pervasiveness that is required to survive summary

judgment, *id.* at 1244. *Mendoza* and the cases cited in that opinion sustained summary

judgment rulings in favor of employers where there was stronger evidence than that

presented by Ms. Byrne. *See id.* at 1246-47 (collecting cases).

19

The *prima facie* case fails for an additional reason.  A strong undercurrent running through Ms. Byrne's claims is her feeling of being a victim of the "dictatorial" leadership and intimidating tactics of Mr. Folmar.  (Doc. # 42-17, at 15 ("Years of work have been disrespected, ignored, and trampled by a new Administrator and his dictatorial style of leadership."); (*see also* Ex. 10 to Doc. # 42 (Pl. Nov. 14, 2005 grievance against Mr. Folmar alleging "hostile work environment through intimidation")); Pl. Dep. 83 (confirming that she is complaining that "Mr. Folmar fostered a hostile work environment through intimidation")).)  It may be that Ms. Byrne is correct, but as in *Mendoza*, the court questions whether the complained-of conduct "includes the necessary . . . gender-related connotations to be actionable sex discrimination[.]," 195 F.3d at 1247.  Title VII only "prohibits discrimination, including harassment that discriminates *based on a protected category such as sex*."  *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1301-02 (11th Cir. 2007) (emphasis added).  Even if Mr. Folmar's management style was intimidating and overbearing, if the conduct was not based upon gender, then Title VII provides no redress.  *See Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995) ("Unfair treatment, absent discrimination based on race, sex, or national origin, is not an unlawful employment practice under Title VII.").  In short, summary judgment is due to be entered in favor of the ABC Board on Ms. Byrne's Title VII gender-based hostile work environment claim.

### 3.      Retaliation

The basis for Ms. Byrne's Title VII retaliation claim against the ABC Board is as follows.  Ms. Byrne says she engaged in protected activities on three occasions:  (1) On November 14, 2005, when she tried to file a grievance against Mr. Folmar with the ABC Board's personnel manager; (2) on July 6, 2006, when she filed an EEOC charge; and (3) on May 21, 2007, when she filed another grievance with the ABC Board against Mr. Folmar.[14] (Doc. # 42-17, at 21.)  Ms. Byrne further complains that, as a consequence of engaging in protected activities, she suffered multiple retaliatory acts.  The retaliatory acts about which Ms. Byrne complains are[15]:  the issuance of the counseling memorandum (November 15, 2005); the denial of attendance at national meetings[16] (occurring between November 2005

---

[14] Ms. Byrne also filed a grievance against Mr. Folmar with the ABC Board on May 25, 2006. Ms. Byrne does not rely upon this grievance in arguing her retaliation claim (Doc. # 42-17, at 21), and consequently, this opinion does not either, *see Resolution Trust Corp.*, 43 F.3d at 599.  It is noteworthy, however, that the only adverse action arguably close in time to Ms. Byrne's May 25, 2006 grievance is the oral reprimand she received on that same date, but Ms. Byrne has not pointed to any evidence from which it can be inferred that the oral reprimand (acknowledgment of which was signed by Ms. Byrne at 8:25 a.m.) occurred *after* she filed her grievance with the ABC Board or that Captain Patton was aware of the grievance when he issued the oral reprimand.

[15] As will become apparent, the dates that the alleged retaliatory acts took place are important to the analysis.  Where the dates of the acts are unclear or are omitted from Ms. Byrne's brief, citations to the record are provided.

[16] In her brief, Ms. Byrne says that she has been denied "previously-approved speaking engagements and travels" and has been "removed from all task forces, committees, and appointed positions[.]"  (Doc. # 42-17, at 22.)  There is, however, no citation to the record, and it "is not the court's function to weed through the summary judgment submissions in search of evidence to support [Ms. Byrne's] position," *Foster v. Mid State Land & Timber Co., Inc.*, No. 2:06cv405, 2007 WL 3287345, at *11 (M.D. Ala. Nov. 5, 2007) (brackets added); (*see also* Uniform Scheduling Order § 2 ("In all briefs, the discussion of the evidence in the brief must be accompanied by a specific reference, by page and line, to where the evidence can be found in a supporting deposition or document.  Failure to make such specific reference will result in the evidence not being considered by the court." (Doc. # 38)).)  In another section of her brief, Ms. Byrne has cited her deposition testimony transcript at pages 150-52, 157

and July 9, 2007, *see* Pl. Dep. 150-52, 157, 159); the denial of additional funding for her department (occurring "after" November 2005, *see* Pl. Dep. 153-54); the removal from her leadership of the Responsible Vendor Program, and the ABC Board's concomitant act of informing others of her removal (beginning in May 2006 with the reorganization, *see* Pl. Dep. 159); the reassignment of job duties to include mostly clerical work (beginning in May 2006); the removal of job tools (beginning in May 2006, *see* Pl. Dep. 199-201); an oral reprimand (May 25, 2006); a written reprimand (May 17, 2007); and a low annual performance appraisal (May 21, 2007).  (Doc. # 42-17, at 21-22.)

To prove a *prima facie* case of retaliation, Ms. Byrne must show (1) that she "engaged in statutorily protected expression; (2) that she "suffered an adverse employment action"; and (3) that "the adverse action was causally related to the protected expression."  *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 978 n.52 (11th Cir. 2008) (citation and internal quotation marks omitted).

Defendants challenge elements two and three of the *prima facie* case.  They contend that the actions about which Ms. Byrne complains are not "sufficiently material and severe to qualify as adverse employment actions."  (Doc. # 41, at 42; *see also* Doc. # 44, at 12-13.) Defendants also argue that the causal link is missing principally because of the "gap in time" between the protected activity and the alleged adverse employment action.  (Doc. # 41, at 42-43.)

---

and 159 (Doc. # 42-17, at 6 ¶ 11), and those citations support a general contention that Ms. Byrne was denied attendance at national meetings.

The standard for proving an adverse employment action is not as onerous in the Title VII retaliation context as in the Title VII anti-discrimination context. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) (Title VII's "antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."). Retaliatory adverse employment actions are those that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (citation and internal quotation marks omitted). Even under this more relaxed standard, however, there exists a materiality requirement "to separate significant from trivial harms." *Id.* Hence, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*; *see also id.* (citing with approval 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed. 1996), which provides that "'personality conflicts at work that generate antipathy'" and "'snubbing by supervisors and co-workers'" are non-actionable under Title VII's anti-retaliation clause). And, while the court will consider the "totality of the alleged reprisals," it will "consider only those that are truly adverse." *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1234 (11th Cir. 2006) (citation and internal quotation marks omitted).

A causal link can be established through evidence "'that the protected activity and the adverse action were not wholly unrelated.'" *Brungart v. BellSouth Telecomms., Inc.*, 231

F.3d 791, 799 (11th Cir. 2000) (quoting *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999)).  "[T]o show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action," *id.*, and that there is a "'close temporal proximity' between the protected expression and [the] adverse . . . action," *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (quoting *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003)).  Common sense dictates that the alleged adverse employment action must "follow[] the protected conduct."  *Griffin v. GTE Fla., Inc.*, 182 F.3d 1279, 1284 (11th Cir. 1999).  Otherwise, it is impossible to prove "that 'the employer was actually aware of the protected expression at the time it took adverse employment action.'"  *Id.* (citation omitted).  As to temporal proximity, in this circuit, lapses of time of more than three months between the alleged adverse action and the employee's statutorily-protected activity uniformly have been found to be insufficient to demonstrate a causal connection, as required to establish a *prima facie* case.  *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (three to four months); *Higdon,* 393 F.3d at 1221 (three months); *Grier v. Snow,* 206 F. App'x 866, 869 (11th Cir. 2006) (eight months); *Hammons v. George C. Wallace State Cmty. Coll.*, 174 F. App'x 459, 464 (11th Cir. 2006) (five months).  The Supreme Court of the United States also has observed that "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case

uniformly hold that the temporal proximity must be 'very close[.]'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (citation omitted). The Court opined that the alleged at-issue retaliatory action "taken . . . 20 months later suggest[ed], by itself, no causality at all." *Id.* The third element of the *prima facie* formulation is where Ms. Byrne's retaliation claims fail.

### a.    November 14, 2005 Grievance

The majority of alleged retaliatory acts that Ms. Byrne says were taken against her in response to her November 14, 2005 grievance occurred between May 2006 and May 2007. Based upon the holdings in *Thomas*, *Higdon*, *Grier* and *Hammons*, the court agrees with Defendants that these alleged retaliatory actions – occurring approximately six to eighteen months after the predicate protected activity – are far too attenuated to establish the requisite causal link.

Some of the acts, however, are alleged to have commenced around the time that Ms. Byrne filed the November 14 grievance. Initially, there are Ms. Byrne's accusations that, as punishment for attempting to file a grievance against Mr. Folmar on November 14, 2005, (1) she has been denied attendance at national conferences and (2) her requests for additional funding for her department have been rejected. The problem for Ms. Byrne, as raised by Defendants, is that she has not provided an evidentiary foundation as to the "specific date" when these acts occurred. (Doc. # 41, at 43.) In her brief, Ms. Byrne says, without any citation to the record, that the alleged acts occurred "immediately after" she filed her

November 14, 2005 grievance. (Doc. # 42-17, at 23.) But, "arguments in brief[s] are not evidence." *United States v. Cardona*, 302 F.3d 494, 497 (5th Cir. 2002).

All that is established by the evidence is that Ms. Byrne "believe[s]" that the rejection of funding occurred "after" November 2005 (Pl. Dep. 154), and that the denials pertaining to conference attendance occurred at some point "between November of '05 and the[-then] present day," which was July 9, 2007 (Pl. Dep. 150-51). On these vague approximations, presenting a time span of approximately twenty months, it can only be speculated whether the acts occurred sufficiently close in time to the alleged protected activity to establish the requisite causal link. Summary judgment, however, cannot be avoided on such speculative guesswork. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (citation and internal quotation marks omitted)); *cf. Weger v. City of Ladue*, 500 F.3d 710, 728 (8th Cir. 2007) ("[W]e need not examine whether [the alleged adverse acts] are sufficiently adverse to satisfy *Burlington Northern* . . . . Plaintiffs have not demonstrated a genuine issue of fact where they have not produced any evidence that the [employer] actually engaged in these acts."). Stated differently, there is, at best, a mere "scintilla of evidence" showing temporal proximity. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) ("A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." (citation omitted)). Aside from her

26

unsupported argument of temporal proximity, Ms. Byrne has offered no other argument or citation to evidence of a causal connection.  The *prima facie* case having collapsed on an essential element, summary judgment is due to be entered in favor of the ABC Board on Ms. Byrne's claim that she was punished for filing the November 14, 2005 grievance by being denied funding and the opportunity to attend conferences.

This leaves the November 15, 2005 non-disciplinary counseling memorandum.  (Pl. Ex. 12 to Doc. # 42.)  That counseling memorandum focused on Ms. Byrne's failure to obtain prior approval for out-of-state travel.  Temporal proximity – the counseling memorandum occurred the day after Ms. Byrne attempted to file the grievance – is present, but temporal proximity is not always adequate to establish a causal connection.  And, it is not adequate in this case.

Discussing the "causal connection" requirement in the context of a Title VII sexual harassment claim, the Eleventh Circuit has observed that, "[w]hen an employer contemplates a given action before the harassment takes place, temporal proximity between the action and the incident of harassment alone will not suffice to show causation."  *Cotton*, 434 F.3d at 1232 (citing *Clark County Sch. Dist.*, 532 U.S. at 272 (stating in a Title VII retaliation case that a causal link between the employee's transfer and her lawsuit could not be established based upon temporal proximity when it was conceded that the employer "was contemplating the transfer before it learned of the suit")).

Also, in *Kasper v. Federated Mutual Insurance Co.*, 425 F.3d 496 (8th Cir. 2005), the Eighth Circuit held that there was insufficient summary judgment evidence to establish the causal link requirement on a Title VII retaliation claim. *See id.* It relied upon unrefuted evidence that two weeks prior to the plaintiff's complaint alleging sexual harassment by a first-tier supervisor, the plaintiff's second-tier supervisor had raised specified issues concerning the plaintiff's job performance: "Evidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation." *Id.* (citation omitted). In *Carrington v. City of Des Moines, Iowa*, 481 F.3d 1046 (8th Cir. 2007), the Eighth Circuit reiterated *Kasper*'s holding, and added that

> "post-hoc complaints did not without more raise a retaliation bar to the proposed discipline because 'the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace.' Indeed, complaining of discrimination in response to a charge of workplace misconduct is an abuse of the anti-retaliation remedy."

*Id.* at 1051 (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 738 (8th Cir. 2004)).

Based upon application of the foregoing authorities, it is true that the counseling memorandum at issue is dated November 15, 2005, the day after Ms. Byrne attempted to file a grievance against Mr. Folmar. That memorandum, however, merely confirmed in a written form an oral "remedial discussion" initiated by Mr. Folmar the previous week, on November 7, 2005, concerning Ms. Byrne's alleged failure to obtain authorization for business travel to Washington, D.C. (Pl. Ex. 12 to Doc. # 41 (Preprinted "counseling session" form providing that it "is to be used by supervisors to document remedial discussions with

28

employees").)   The November 7 discussion occurred *prior to* Ms. Byrne's attempt on November 14, 2005, to file a grievance against Mr. Folmar, which is the alleged protected activity.[17]   In other words, based upon this undisputed evidence, the court finds that Mr. Folmar's performance criticism of Ms. Byrne occurred before she tried to file her grievance against him.

Accordingly, the court finds that the fact that the form documenting the November 7, 2005 meeting was prepared the day after Ms. Byrne attempted to file her grievance does not by itself create a genuine issue of material fact on the issue of whether there was a causal connection between the grievance and the counseling memorandum.   To find otherwise would frustrate an employer's ability to discipline an employee who had filed a complaint alleging discrimination.   The court, therefore, finds that Ms. Byrne has failed to raise a genuine issue of material fact on the issue of causation and thus, that her *prima facie* case fails.   Even assuming that Ms. Byrne could hurdle the *prima facie* case as to this particular alleged protected activity (*i.e.*, the November 14, 2005 grievance) and the alleged retaliatory act (*i.e.*, the November 15, 2005 counseling memorandum) she has not presented evidence that raises a genuine issue on the question of pretext, *see infra* note 18.

---

[17] It also occurred after Mr. Folmar had issued a written directive to all ABC Board employees that "all requests for any ABC Board personnel to speak, make appearances, or do workshops outside of this agency, must first be approved by [the Administrator]."   (Defs. Ex. 3 to Pl. Dep. (Doc. # 40-3).)

#### b.      July 6, 2006 EEOC Charge

This brings the discussion to Ms. Byrne's filing of her EEOC charge on July 6, 2006. All but two alleged adverse actions happened prior to the date the EEOC charge was filed. Obviously, the actions that preceded July 6, 2006, could not have been imposed as punishment against Ms. Byrne for filing an EEOC charge since they had not yet occurred. *See Griffin*, 182 F.3d at 1284 (The alleged adverse action must "follow[] the protected conduct."). The only two actions that postdate Ms. Byrne's filing of her EEOC charge are the written reprimand Ms. Byrne received on May 17, 2007, and the alleged low annual performance appraisal, dated May 21, 2007. But, these two acts occurred more than nine months after the protected activity. The gap in time obviously is much longer than the time periods that were found insufficient to demonstrate a causal connection in the cases cited above. Because the only evidence linking these events is a temporal proximity of more than nine months, Ms. Byrne has failed to demonstrate the requisite causal connection.

#### c.      May 21, 2007 Grievance

As to Ms. Byrne's retaliation claim predicated on her May 21, 2007 grievance filed with the ABC Board against Mr. Folmar, all but one alleged adverse action preceded May 21, and that lone retaliatory act – the alleged low annual performance appraisal – occurred on the same date that Ms. Byrne filed the May 21 grievance with the ABC Board. There is no evidence that the performance appraisal occurred after that filing, or that, if it did, Captain

Patton was aware of the internal grievance when he issued the performance appraisal.  This retaliation claim likewise does not survive summary judgment.

### d.     Summary of Retaliation Claims

Because Ms. Byrne has failed to submit evidence from which a reasonable jury could find a causal connection between the alleged adverse actions and protected activities, Ms. Byrne's *prima facie* case on each of her retaliation claims fails.[18]  It, therefore, is unnecessary to decide if the actions she challenges would meet the definition of "adverse employment action" set forth in *Burlington Northern & Santa Fe Railroad Corp.*, 548 U.S. at 68. Summary judgment is due to be entered in the ABC Board's favor on Ms. Byrne's retaliation claims.

## VI.  CONCLUSION

Accordingly, it is ORDERED that Defendants Alabama Alcoholic Beverage Control Board and Emory Folmar's Motion for Summary Judgment (Doc. # 40) is GRANTED.

An appropriate judgment will be entered.

Done this 29th day of June, 2009.

/s/  W.  Keith Watkins
UNITED STATES DISTRICT JUDGE

---

[18] Even if Ms. Byrne had established a *prima facie* case on her Title VII retaliation claims, the ABC Board has come forward with legitimate and nondiscriminatory reasons for its actions (Doc. # 41, at 39-40, 44; Doc. # 44, at 9-11).  Ms. Byrne's arguments as to pretext are unavailing.  (Doc. # 42-17, at 16-17.)